IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARINELLA PICARDI | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PULMONARY CONSULTANTS, INC. | : | NO. 24-1440 |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                May 21, 2025

Defendant, Pulmonary Consultants, Inc., seeks summary judgment in this age and

sex discrimination case brought by Plaintiff, Marinella Picardi.  Because I find that there

is no genuine dispute as to any material fact and that Defendant is entitled to judgment as

a matter of law, I will grant the motion and enter judgment for Defendant and against

Plaintiff.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff worked for Defendant as Practice Administrator from February 7 to June

27, 2022, and was sixty-six years of age throughout her period of employment.  See

Complaint (Doc. 1) ¶¶ 10-11; Deposition of Marinella Picardi, attached to response at

Exh. A (Doc. 30-1) ("Pl. Dep."), at 6-7, 23.[2]  Plaintiff was hired by Gary D. Wendell,

---

[1]The facts presented are either not disputed or taken in the light most favorable to
Plaintiff as the non-moving party.  Except for the deposition transcripts, which can be
found at Docs. 30-1 and 30-2, pinpoint citations will be to the court's ECF pagination.

[2]Plaintiff was born on July 20, 1955.  Pl. Dep. at 6.  Therefore, Defendant's
assertion that Plaintiff was sixty-eight years of age throughout the relevant period, see
Def.'s Statement of Undisputed Facts ("SUF") ¶ 2, is erroneous.  Rather, Plaintiff was

M.D., one of Defendant's four physician-owners,[3] and reported to him.  Pl. Dep. at 10-11.

Dr. Wendell had approached Plaintiff because Defendant's practice manager was leaving,

and Dr. Wendell was familiar with Plaintiff's experience working at another medical

practice.  Id. at 8-9; see also Wendell Dep. at 14-15 (he offered Plaintiff the position

because he knew her in her capacity in charge of medical records at another facility, and

she was helpful to him and friendly with Defendant's former practice administrator).

    As Practice Administrator, Plaintiff played a managerial role.  Wendell Dep. at 20.

Her responsibilities included, among other things, supervising, training, and evaluating

office staff; setting the staffing schedule and approving paid time off and overtime;

developing and implementing office policies and procedures; ensuring compliance with

laws, regulations, ethical and customer service standards; liaising with doctors and nurses

to identify potential office dysfunctions; overseeing financial operations such as billing,

coding and payments to vendors; using required software for electronic medical record,

billing, scheduling, and payroll; submitting timesheets; maintaining medical and staff

records; ensuring licenses, certificates, credentials, and malpractice insurance were up to

date and renewed on time; and ordering medical and office supplies as needed.  SUF

¶ 14; Pl. Resp. to SUF ¶ 14.  Although Plaintiff understood that she was not a partner, she

---

sixty-eight years of age when she commenced this action.  Plaintiff's Response to
Defendant's Statement of Undisputed Facts (Doc. 30-4) ("Pl. Resp. to SUF"), ¶ 2.

    [3]The other owners were Pierre Frederique, M.D., Asad Khan, M.D., and Wei Bin,
M.D. (collectively with Dr. Wendell, the "Partners").  See Deposition of Dr. Wendell,
attached to response at Exh. B (Doc. 30-2) ("Wendell Dep."), at 8-9.

expected to be involved in communicating with the Partners and was initially invited to the Partners' meetings.  Pl. Dep. at 11-12.

Plaintiff was told that Defendant's support staff reported to her, Pl. Dep. at 25, and she proposed to the Partners that she could train the staff on how to use electronic systems, such as the digital electronic medical record systems ("DEMR"), because there were many functions that were not being utilized by Defendant, several staff members had no idea how to use the system, and it would be helpful to Defendant's practice to modernize its recordkeeping.  Id. at 25-28.  Although she scheduled several virtual trainings with the DEMR representative, Dr. Frederique would repeatedly pull the staff away to work on other things.  Id. at 29-30, 38.  Similarly, although her title, roles, duties, and responsibilities did not change during her period of employment, id. at 40, the execution of her duties changed "because they were regularly being rerouted and interrupted" by Dr. Frederique, who would remove Plaintiff's directives to staff and thereby create chaos.  Id. at 40-41.

Plaintiff described Dr. Frederique as "very intimidating" and "condescending" to the older female staff, Pl. Dep. at 41, and stated that he would regularly enter her office to ask her what she was working on, interrupting her work without apology.  Id. at 43. Plaintiff also saw Dr. Frederique get very angry with a female nurse practitioner for not staying beyond her contracted shift and demanded that Plaintiff fire her, but after speaking with the other Partners he backed down.  Id. at 52-53.

Plaintiff could not recall whether any employee or supervisor ever made any derogatory or inappropriate comment relating to Plaintiff's sex or gender during her

employment, Pl. Dep. at 91, but she heard women staff members referred to as "girls" and believed it was intended to make them "feel like they were insignificant" id. at 92, and she said to Dr. Wendell that they should be referred to as women.  Id. at 132.  Aside from these remarks, Plaintiff perceived her sex discrimination claims in Dr. Frederique's routinely frustrating her efforts to modernize and improve the practice, and targeting Plaintiff for micromanagement.  Pl. Dep. at 30, 123; see also Pl. Resp. to SUF ¶ 22. When asked how she was harassed by Dr. Frederique, Plaintiff explained that he would walk into her office every day and expect immediate responses to everything -- the same demanding treatment he gave to other older women in the office, but not to the younger women.  Pl. Dep. at 96-97.

The only explicit age-related comment directed to her that Plaintiff attributes to Defendant is that Dr. Wendell said to her during her recruitment, "I guess you're going to be -- you're about my age, so you're going to be re -- you're going to be leaving -- you're going to be retiring soon."  Pl. Dep. at 85, 94-95.  Plaintiff perceived that older employees were treated less favorably than younger employees.  For example, the Partners resisted her efforts to train the older staff on a new computer system, with Dr. Wendell stating that the older staff members were "too old to learn anything" and that Plaintiff "should just give it up."  Id. at 66, 67.  Plaintiff also learned that older workers (not including her) were underpaid compared to younger employees, id. at 73, and she successfully recommended to the Partners that the older workers be given a pay increase to establish pay parity and improve the chances of recruiting new, qualified staff.  Id. at 74-77.  When asked how she was specifically treated differently because of her age,

Plaintiff identified her exclusion from partner meetings (id. at 81, 83-84, 86) and the

disrespectful treatment by Dr. Frederique (id. at 81-82).[4]

The conflict between Plaintiff and Dr. Frederique came to a head on June 27,

2022, and culminated in Plaintiff's separation from employment.  The exchanges began

that morning when Plaintiff sent an email to the Partners in which she, in response to

staff advising her of changes to billing practices, stated:  "So, I'm really sorry to hear that

you are continuing to exclude me from crucial conversations regarding office processes,

staff and duties and running the risk of missed billing."  6/27/22 email (11:19 a.m.),

attached to Response at Exh. C (Doc. 30-3 at 2) ("11:19 a.m. email").  Plaintiff further

stated in relevant part:

> [M]y larger concern is that decisions regarding
> personnel time and office management process are being
> changed without any consideration to the larger impact, or to
> input from me.  I have to ask you to clarify what exactly you
> would like my duties to be as I find the current situation of
> having to play catch-up as a result of decisions made without
> my input or without my being even involved in the
> conversation really difficult to manage. . . .  Clearly, this is
> your Practice and it is absolutely your decision as who should
> manage the office operations and I am more than happy to
> step aside in any areas as you deem fit for your business
> operations but I need to know clearly what I am responsible
> for.

Id.

---

[4]Plaintiff testified that the younger staff were treated differently with respect to corrective action, but was not able to identify an instance where this was the case.  Pl. Dep. at 63-65.

Shortly after Plaintiff sent that email, Dr. Frederique went to Plaintiff's office to address ongoing concerns regarding billing.  Plaintiff described the encounter as physically intimidating, with the doctor moving toward her desk and waving a yellow piece of paper between his fingers, causing her to back up and for her chair to hit the wall, and then leaving without giving her a chance to explain what she was working on. Pl. Dep at 43-50.  Dr. Frederique did not make physical contact with Plaintiff or move the desk, which remained between them throughout the encounter.  Id. at 50.  As he left, he yelled that he "had witness," pointing to two employees who were not present during the encounter.  Id. at 44.

Plaintiff quickly memorialized the encounter with Dr. Frederique in an email to Dr. Wendell.  See 6/27/22 email (12:16 p.m.), attached to Response at Exh. C (Doc. 30-3 at 3) ("12:16 p.m. email"); see also Pl. Dep. at 50 (after Dr. Frederique left her office, "I immediately emailed Dr. Wendell").  Plaintiff explained that Dr. Frederique accused her of not following up on his request regarding billing and other items, waved his hand holding a slip of paper, and "told me I will not have to deal with billing issues at all anymore because he would handle it all."  12:16 p.m. email.  Plaintiff concluded the email:

> Dr. Wendell, at this point I'm not sure what this apparently adversarial posturing is all about.  I would not expect to be treated like this if I were a valued member of an organization. Please let me know at your earliest if you would like me to leave.  There is absolutely no need for this type of behavior

and treatment – neither I nor anyone else on staff should be
subjected to anything like this.

Id.

Later that afternoon, Dr. Frederique sent an email to Plaintiff and the other

Partners in the same chain as Plaintiff's 11:19 a.m. email, excerpted here:

> This practice has been jeopardized as a result of billing not
> being forwarded on [sic] a timely manner.  . . .  This occurred
> on your watch as you did not send all the available billing to
> the company.  This was your most important duty.  . . .  Yo[u]
> are not the only party to blame for this near catastrophe.  The
> billing company should have informed the Partners of the
> difficulties they were having with obtaining our billing as
> soon as it was a problem.  We, the Partners . . . should have
> been vigilant . . . .
>
> To prevent a similar catastrophe from returning, myself and
> Dr. Khan will take over all aspects of the billing process.  We
> will designate which staff members communicate with the
> billing company.  . . .
>
> You have many responsibilities.  Paramount is immediately
> starting the process of closing the Salem office.

6/27/22 email (4:37 p.m.), attached to Response at Exh. C (Doc. 30-3 at 4) ("4:37 p.m.

email").[5]

Plaintiff responded to Dr. Frederique's email approximately one hour later, using

the same chain to send an email to the Partners and another member of staff.  6/27/22

email (5:32 p.m.), attached to Response at Exh. C (Doc. 30-3 at 5) ("5:32 p.m. email").

The email states in relevant part:

---

[5]With respect to billing, Dr. Wendell similarly testified that the biller informed
Plaintiff that they were not receiving billing, but that neither Plaintiff nor the biller
informed the Partners of the problem, leading to financial problems.  Wendell Dep. at 25.

> I am shocked that you would accuse me of being responsible
> for billing not sent or for the Practice's revenue issues?  I am
> amazed at your demeanor toward me so often disrespectful,
> and I find your accusations below untrue, libelous and
> slanderous.
>
> I have been here since 2/4/2022 – I have received the same
> treatment from you consistently[.]
>
> . . . .
>
> I was hired by the President of the Practice, Dr. Wendell[,]
> and I was told I report to him.  Your email . . . indicates you
> speak for the partners.  I can only surmise the partners have
> agreed to significantly reduce my responsibilities, are all
> dissatisfied with my performance and believe your allegations
> rather than give me the opportunity to hear what I have to say.
> I presume that your email therefore serves to let me know that
> I am not considered a valued or welcomed employee at
> Pulmonary Consultants and accept your email as my
> termination notice effective now.

Id.  The next morning, Dr. Wendell and Plaintiff exchanged text messages.  See 6/28/22

& 6/29/22 text messages between Dr. Wendell and Plaintiff, attached to Def.'s motion at

Exh. D (Doc. 27-9 at 2-3) ("Text messages").  In the first and most relevant text, sent at

7:34 a.m., Dr. Wendell stated:

> Called you yesterday evening after I saw your last email . . .
> but you did not return my call.  Dr. Frédérique's email
> however disapproving was not a termination letter.  If you are
> resigning I respect your decision yes but will leave me with
> lots of loose ends.  If you are not resigning will speak when
> you are in this morning.

Id.  Plaintiff did not return to work.  Pl. Dep. at 61-62.

During her four-month period of employment, Plaintiff was the highest paid

member of the staff with a salary of $95,000 per year.  Pl. Dep. at 21; SUF ¶ 9; Pl. Resp.

to SUF ¶ 9.  During this period, there was no change to her rate of pay, benefits or title. Pl. Dep. at 40; SUF ¶ 7; Pl. Resp. to SUF ¶ 7.  She was never formerly or informally disciplined, suspended, placed on a performance improvement plan, or given a performance evaluation, Pl. Dep. at 57, and no one ever told her that she was fired.  Id. at 58.  Additionally, except for physicians, all of Defendant's staff members from the time of Plaintiff's hiring to the present have been female.  Wendell Dep. at 78; SUF ¶ 10-11; Pl. Resp. to SUF ¶ 10.[6]  Following the end of Plaintiff's employment, Defendant replaced her with a 40-year-old female, who was in turn replaced by a 42-year-old female.  SUF ¶¶ 12-13; Pl. Resp. to SUF ¶¶ 12-13.

On April 5, 2024, Plaintiff filed her Complaint in the present litigation, alleging discrimination and hostile work environment based on age under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA") (Count I), discrimination and hostile work environment based on sex under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq., as amended by the Civil Rights Act of 1991 ("Title VII") (Count II), and discrimination and hostile work environment based on age and sex under the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA") (Count III).  Id. (Counts I-III).[7]

---

[6]Defendant avers that at the time of her Plaintiff's departure, all but one of Defendant's employees were over forty years of age.  SUF ¶ 11; see also Wendell Dep. at 78 (describing the staff as "[a] hundred percent female" and "[t]he vast majority over forty.  Maybe one or two employees under 40.").  Plaintiff denies this averment, citing a lack of record evidence as to the age of Defendant's employees.  Pl. Resp. to SUF ¶ 11.

[7]Plaintiff also raised claims of retaliation, Complaint ¶¶ 38, 42, 46, but she does not oppose Defendant's motion as to those claims.  Doc. 30 at 3 n.1 ("Plaintiff responds

Before the court is Defendant's motion for summary judgment seeking entry of judgment in its favor on all counts, Doc. 27-3, and Plaintiff's response in opposition. Doc. 30.

## II.    <u>LEGAL STANDARD</u>

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).[8] A factual dispute is "material" if it might affect the outcome of the case under governing law. <u>Id.</u>

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1)(A), (B). "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." <u>Boykins v. Lucent Techs., Inc.</u>, 78 F. Supp.2d 402, 408 (E.D. Pa. 2000).

---

to Defendant's Motion only with respect to her claims of age discrimination, sex discrimination, and age and sex-based hostile work environment . . . ."). I therefore will not discuss retaliation in this Memorandum.

Plaintiff alleged in her Complaint that she administratively exhausted her claims, Complaint ¶ 5, and Defendant does not raise any issue as to exhaustion.

[8]<u>Anderson</u> predated the 2010 Amendment to Rule 56. However, the change in wording and location within the rule for the summary judgment standard did not alter the standard or caselaw interpretation of the standard. Fed. R. Civ. P. 56 advisory committee's note to 2010 Amendment.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny Pa., 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., 998 F.2d 1224, 1240 (3d Cir. 1993)). Rather, the court must consider the evidence and all reasonable inferences which may be drawn from it, "in the light most favorable to the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 487 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). If a conflict arises between the evidence presented by the parties, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in [their] favor." Anderson, 477 U.S. at 255; see also Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 362 (3d Cir. 2008) (in employment discrimination context, "[t]he employer must persuade [the court] that even if all of the inferences which could reasonably be drawn from the evidentiary materials of record were viewed in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiff's favor").

III.    **DISCUSSION**

As previously noted, Plaintiff alleges that Defendant subjected her to a hostile work environment and discrimination based on her age (ADEA Count I) and sex (Title VII Count II), ultimately resulting in her constructive discharge, and that the same conduct also amounts to violations under the PHRA (Count III). I will address the hostile work environment claims first.

11

A.    **Hostile Work Environment**

To survive an employer's summary judgment motion on a hostile work

environment claim under either the ADEA or Title VII, a plaintiff must show "(1) [s]he

suffered intentional discrimination because of [her] age/sex; (2) the harassment was

severe or pervasive; (3) the harassment detrimentally affected [her]; (4) the harassment

would detrimentally affect a reasonable person in that position; and (5) respondeat

superior liability."[9]  Power v. Lockheed Martin Corp., 419 F. Supp.3d 878, 902 (E.D. Pa.

2020) (ADEA) (quoting Howell v. Millersville Univ. of Pa., 283 F. Supp.3d 309, 332

(E.D. Pa. 2017) (ADEA)); see also Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006)

(Title VII).  "The alleged harassment 'must be so severe or pervasive that it alters the

conditions of [plaintiff's] employment and creates an abusive environment.'"  Howell,

283 F. Supp.3d at 332 (quoting Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir.

2001) (Title VII)).[10]  "Stray" or "offhand" remarks "generally are considered insufficient

to support an inference of discrimination."  Id.; see also Caver v. City of Trenton, 420

F.3d 243, 262 (3d Cir. 2005) ("'offhanded comments, and isolated incidents (unless

---

[9]The same elements are required for hostile work environment claims brought
under the PHRA.  See, e.g., Griswold v. Drexel Univ., Civ. Action No. 22-568, 2024 WL
921390, at *6 n.8 (E.D. Pa. Mar. 1, 2024).

[10]Both Jensen and Weston were overruled in part on other grounds by Burlington
N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006), which held that Title VII's
retaliation provision is not limited to an employer's employment-related or workplace
actions, abrogating the Third Circuit's holding in Robinson v. Pittsburgh, 120 F.3d 1286
(3d Cir. 1997).

extremely serious)' are not sufficient to sustain a hostile work environment claim")

(quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

The terms "severe" and "pervasive" "represent two distinct types of hostile work

environment claims." Castleberry v. STI Grp., 863 F.3d 259, 264 (3d Cir. 2017).

"[S]ome harassment may be severe enough to contaminate an environment even if not

pervasive; other, less objectionable, conduct will contaminate the workplace only if it is

pervasive," id., and the determination of either is based on the totality of the

circumstances rather than individual incidents. See Qin v. Vertex, Inc., 100 F.4th 458,

471 (3d Cir. 2024) (courts should "concentrate not on individual incidents, but on the

overall scenario") (quoting Caver, 420 F.3d at 262-63). "In determining whether an

environment is hostile or abusive, we must look at numerous factors, including 'the

frequency of the discriminatory conduct; its severity; whether it is physically threatening

or humiliating, or a mere offensive utterance; [and] whether it unreasonably interferes

with an employee's work performance.'" Weston, 251 F.3d at 426 (quoting Harris v.

Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). Although offending conduct must be either

"severe" or "pervasive," courts should take care to not only "parse out the individual

incidents," but consider the totality of the conduct in determining "whether the acts that

collectively form the continuing violation are severe or pervasive." Mandel v. M&Q

Packaging Corp., 706 F.3d 157, 168 (3d Cir. 2013).

Even considered together, none of the offending conduct Plaintiff relies on

implicate "severe" harassment. Examples of conduct that meets this type of hostile work

environment show "extremely serious" misconduct such as slurs accompanied by threats

of termination, or sexual harassment and assault.  See, e.g., Starnes v. Butler Cnty. Ct. of Com. Pl., 50th Jud. Dist., 971 F.3d 416, 428 (3d Cir. 2020) (harassment "severe" where, among other things, plaintiff's supervisor "coerced her into engaging in sexual relations"); Moody v. Atl. City Bd. of Educ., 870 F.3d 206, 215 (3d Cir. 2017) (harassment "severe" where plaintiff's employer, among other things, "made sexually charged comments to her," grabbed her," "attempted to take her shirt off," and "showed up at her house uninvited and pressured her into having sex with him by threatening her job"); Briggs v. Temple Univ., 339 F. Supp.3d 466, 503-05 (E.D. Pa. 2018) (adequate evidence of age-based hostile work environment where totality of circumstances included superior yelling degrading things about plaintiff in public such as "you are stupid" and "can't you speak English" and stating to plaintiff that in China people of plaintiff's age are "put out to pasture," which plaintiff described as daily bullying).

The record contains nothing similar to these examples.  The most disturbing incident Plaintiff describes is the June 27 interaction in her office with Dr. Freqerique, and although that encounter was no doubt upsetting, she described no age-based or sexual overtones, it was brief, and Plaintiff does not contend that Dr. Frederique physically touched or threatened her.

Nor does the alleged offending conduct arise to the "pervasive" level.  As noted, isolated comments will not establish pervasive harassment, and comments not made directly to the plaintiff are less likely to constitute sufficiently pervasive harassment.  See Watkins v. Pa. Dep't of Corr., No. 22-1426, 2023 WL 5925896, at *4 (3d Cir. Sept. 12, 2023) (not precedential) ("fact that the comment was not made directly to [plaintiff]

14

further supports that it is the type of 'offhand[] comment[] . . . that . . . 'should not be considered severe or pervasive'") (quoting <u>Caver</u>, 420 F.3d at 263); <u>see</u> <u>also</u> <u>Lamb v. Montgomery Twp.</u>, 734 Fed. App'x 106, 112 n.8 (3d Cir. 2018) ("occasional derogatory comments not intentionally directed at a plaintiff, but simply overheard by a plaintiff, are not sufficient to establish a hostile work environment").

Here, with respect to her age-based claim of hostile work environment, Plaintiff claims that Dr. Wendell referenced her age and expected retirement "on several occasions," Doc. 30 at 6, including his comment prior to hiring her that "you're about my age, so you're going to be . . . retiring soon." Pl. Dep. at 94-95. She also learned that older staff were earning less than younger staff, which she took steps to remedy. She was "thwarted" in her attempts to discipline younger staff and in trying to train the older workers in new systems. Plaintiff also felt generally that older members of the staff were not treated well and were made to feel intimidated, especially by Dr. Frederique, and she herself felt intimated by Dr. Frederique particularly during the June 27 encounter. However, even considered together, this conduct does not add up to an actionable claim of hostile work environment. In short, there is insufficient evidence of pervasive misconduct to sustain a finding of hostile work environment.

Even if Plaintiff's belief that the conduct was harassing was deemed reasonable under the circumstances, there is insufficient evidence regarding the frequency and number of such comments during Plaintiff's less than five-month period of employment. <u>See</u>, <u>e.g.</u>, <u>Hamera v. Cnty. of Berks</u>, 248 Fed. App'x 422, 425-26 (3d Cir. 2007) (harassing comments not pervasive where co-workers "made nine comments over a year

and four months"); Stephenson v. City of Phil., Civ. Action No. 05-1550, 2006 WL
1804570, at *11 (E.D. Pa. June 28, 2006) (nine comments over nineteen months
"collectively lack the frequency to constitute a hostile work environment claim").

With respect to her claim of sex-based hostile work environment, the evidence is
in even shorter supply.  Plaintiff heard Defendant's female employees referred to as
"girls" which she felt was disrespectful.  Similar to her age-based claim, she felt that
women were not treated well or respected, although she did not provide examples other
than the references to "girls" and her own exclusion from the partners' meetings.  Again,
even taken together, Plaintiff has not put forth sufficient evidence to reach a jury on sex-
based hostile work environment.

For these reasons, Plaintiff fails to make a showing of either severe or pervasive
harassment.  Therefore, Defendant is entitled to summary judgment on Plaintiff's age and
sex-based hostile work environment claims in Counts I, II, and III.

**B.    Discrimination Claims - Burden-Shifting Framework**

Plaintiff's remaining claims of discrimination are analyzed under the familiar
burden-shifting paradigm.  In McDonnell Douglas Corporation v. Green, the Supreme
Court set forth a three-part burden-shifting framework for the courts to utilize when
analyzing employment discrimination claims.  411 U.S. 792, 802-05 (1973).  The first
prong is a determination of whether the plaintiff has met his or her initial obligation to
establish a prima facie case of discrimination.  Id. at 802; see also Keller v. Orix Credit
All., Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (reaffirming the application of a "slightly
modified version of [McDonnel Douglas] in ADEA cases)).  Satisfying the prima facie

elements creates an "inference of unlawful discrimination."  <u>Willis v. UPMC Child.'s Hosp.</u>, 808 F.3d 638, 644 (3d Cir. 2015) (citing <u>Pivirotto v. Innovative Sys., Inc.</u>, 191 F.3d 344, 357 (3d Cir. 1999)).  Thus, if Plaintiff fails to raise a genuine issue of material fact as to any element of her prima facie case of discrimination, summary judgment in favor of Defendant is warranted.  <u>Hanafy v. Hill Int'l, Inc.</u>, 669 F.Supp.3d 419, 433 (E.D. Pa. 2023) (citing <u>Geraci v. Moody-Tottrup, Int'l, Inc.</u>, 82 F.3d 578, 580 (3d Cir. 1996)); <u>see also Dorsey v. Pittsburgh Assocs.</u>, 90 F. App'x 636, 639 (3d Cir. 2004) (if the plaintiff fails to satisfy the prima facie elements, the court can dispose of the case "without the heavy lifting that is required if a prima facie case is made out").

If the elements of a prima facie case are met, the second prong of the <u>McDonnell Douglas</u> framework provides the defendant-employer with the opportunity to show that it had legitimate, non-discriminatory reasons for its challenged actions.  411 U.S. at 802; <u>Willis</u>, 808 F.3d at 644.  Finally, in the third prong, the burden shifts back to the plaintiff to show that the defendant's articulated reasons are mere pretext for discrimination. <u>McDonnell Douglas</u>, 411 U.S. at 804-05; <u>Willis</u>, 808 F.3d at 644-45.

The three-part burden-shifting framework applies to Plaintiff's claims under the ADEA and Title VII.  <u>See</u> <u>Walton v. Mental Health Ass'n of Se. Pa.</u>, 168 F.3d 661, 666 (3d Cir. 1999) (<u>McDonnell Douglas</u> burden-shifting applies to ADEA); <u>Bequeath v. L.B. Foster Co.</u>, 367 F. Supp.2d 779, 784 n.3 (W.D. Pa. 2005) (<u>McDonnell Douglas</u> burden-shifting applies to ADEA and ADA as well as to Title VII).  The same framework applies to claims brought under the PHRA.  <u>See, e.g.</u>, <u>Daniels v. Sch. Dist. of Phila.</u>, 776 F.3d 181, 193 (3d Cir. 2015) (applying <u>McDonnell Douglas</u> framework to ADEA and PHRA

claims); <u>DeMaio v. Bed, Bath & Beyond of King of Prussia, Inc.</u>, Civil Action No. 03-

5957, 2005 WL 174842, at *8 n.1 (E.D. Pa. Jan. 25, 2005) ("The Pennsylvania Supreme

Court has adopted the <u>McDonnell Douglas</u> framework for analysis of PHRA claims.")

(citing <u>Allegheny Housing Auth. v. Commonwealth of Pa. PHRC</u>, 532 A.2d 315, 316-18

(Pa. 1987)).  Thus, the court's analysis of Plaintiff's federal and PHRA claims will

proceed in tandem.

### 1.    <u>Age discrimination</u>

Under the ADEA, it is "unlawful for an employer . . . to fail or refuse to hire or to

discharge any individual or otherwise discriminate against any individual with respect to

his compensation, terms, conditions, or privileges of employment, because of such

individual's age."  29 U.S.C. § 623(a)(1).  A prima facie case of age discrimination under

the ADEA requires Plaintiff to show that she was (1) over forty years of age, (2) qualified

for the position at issue, (3) subject to an adverse employment action, and (4) that

someone sufficiently younger assumed her duties or was treated more favorably as to

create an inference of age discrimination.  <u>Steward v. Sears Roebuck & Co.</u>, 231 Fed.

App'x 201, 207 (3d Cir. 2007).  Because the ADEA requires the plaintiff to prove that

the defendant took the alleged adverse employment action "because of [the plaintiff's]

age," 29 U.S.C. § 623(a)(1), the Supreme Court has construed the statute to require a

plaintiff to prove but-for causation in age discrimination cases.  <u>Gross v. FBL Fin.</u>

<u>Services., Inc.</u>, 557 U.S. 167, 176-77 (2009).

There is no dispute that Plaintiff meets the first two elements.  She was sixty-six

years old for the duration of her employment with Defendant, and she was hired as

Defendant's Practice Administrator precisely because she was qualified for the position. See Doc. 27-2 at 7.

With respect to the fourth element, Defendant argues that Plaintiff cannot satisfy this element because her two successive replacements were members of the same protected class, meaning women over forty years of age. See Doc. 27-2 at 8 (noting Defendant replaced Plaintiff with a forty-year-old female, who was subsequently replaced by a forty-two-year-old female). However, case law clearly indicates that "sufficiently younger" refers to the age gap between the plaintiff and the person who assumed the plaintiff's duties, not whether the replacement was outside the protected class. See, e.g., Santiago v. Brooks Range Cont. Servs., Inc., Civ. Action No. 11-7269, 2014 WL 4930918, at * 8 (E.D. Pa. Sept. 30, 2014) (fourth element satisfied where seventy-three-year-old plaintiff was replaced by forty-five-year-old). It can be difficult for courts to determine whether a plaintiff was replaced by someone "sufficiently younger" so as to create an inference of age discrimination. See, e.g., Steward, 231 Fed. App'x. at 209-10 (declining to adopt brightline rule that average 6.75-year age difference was insufficient to satisfy fourth element, but concluding that fifteen-year difference was sufficient) (collecting cases). However, no such difficulty is presented here because the age gap between Plaintiff (aged sixty-six) and her immediate replacement (aged forty) was twenty-six years, which is clearly sufficient to create an inference of age discrimination. See, e.g., Santiago, 2014 WL 4930918, at * 8 ("An age difference of more than 20 years is sufficient to satisfy the fourth element of Plaintiff's *prima facie* case.") (citing Maxfield v. Sinclar Int'l., 766 F.2d 788, 793 (3d Cir. 1985)).

Therefore, the key issue is whether a genuine issue of material fact exists as to the third element of Plaintiff's prima facie case, namely whether Plaintiff was subjected to an adverse employment action.  To satisfy this element, "an employee must allege an adverse employment action sufficiently severe to have altered the employee's 'compensation, terms, conditions, or privileges of employment, or to have deprived or tended to deprive him of employment opportunities or otherwise adversely affected his status as an employee.'"  Howell, 283 F.Supp.3d at 324 (quoting Mayk v. Reading Eagle Co., Civ. Action No. 08-4866, 2010 WL 1141266, at *5 (E.D. Pa. Mar. 24, 2010)).  A plaintiff does not have to "show economic or tangible discrimination."  Id.  As the court stated in Mayk, an adverse employment action can include a "reassignment with significantly different responsibilities," whereas a demotion that involves no change in benefits, duties or prestige is not sufficient.  2010 WL 1141266, at *5 (quoting and citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).

Plaintiff's argument on this element rests entirely on her assertion that she was constructively discharged.  Doc. 30 at 12-14 ("Plaintiff has met [the third] prong[] of the prima facie case, as Defendant constructively terminated her employment," and refuting Defendant's argument that she voluntarily resigned).[11]  Constructive discharge is a particular type of adverse employment action in which a plaintiff "must show that 'the

---

[11]In light of Plaintiff's reliance on her constructive discharge, I need not determine whether Dr. Frederique's alteration of Plaintiff's duties by itself would constitute an adverse employment action.  See 4:37 p.m. email (taking over "all aspects of the billing process" from Plaintiff, and stating "[y]ou have many responsibilities.  Paramount is immediately starting the process of closing the Salem office.").

employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'" Reifinger v. Parkland Sch. Dist., 601 F. App'x 138, 142 (3d Cir. 2015) (quoting Gross v. Exxon Off. Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984)).  This requires "a greater severity of pervasiveness of harassment than the minimum required to prove a hostile working environment." Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 317 n.4 (3d Cir. 2006).  "[S]everal factors . . . may be indicative of constructive discharge: (1) threat of discharge; (2) suggesting or encouraging resignation; (3) a demotion or reduction of pay or benefits; (4) involuntary transfer to a less desirable position; (5) alteration of job responsibilities; and (6) unsatisfactory job evaluations." Lebovsky v. City of Philadelphia, 394 F. App'x 935, 939 (3d Cir. 2010) (citing Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993)).

In support of her argument that she has satisfied her prima facie burden as to constructive discharge, Doc. 30 at 12-13, Plaintiff cites Checa v. Drexel University, Civ. Action No. 16-108, 2016 WL 3548517 (E.D. Pa. June 28, 2016), which is instructive. That case arose under the Family Medical Leave Act, and plaintiff asserted that the actions her employer took upon her return from leave (for surgery and to care for her dying mother) amounted to constructive discharge.  In particular, on her first day back plaintiff was required to attend a meeting with other two employees (one in administrative support and the other who covered for plaintiff during her leave) who were not welcoming and who presented her with a list of tasks she failed to complete before she went on leave, to which plaintiff responded "I quit." Id. at *2.  She returned to her

office and called her immediate supervisor to inform her of the meeting and reiterate that "I quit." Id. The next day, plaintiff met with her supervisor and "attempted to retract her resignation," but was later advised that the head of the department did not accept her request. Id. The Honorable Mark Kearney rejected plaintiff's argument that she presented sufficient evidence to reach a jury on the question of constructive discharge. Id. at *4-5. "Factors indicative of a constructive discharge include a threat of discharge or suggestion of resignation, demotions or reductions in pay or benefits, involuntary transfer to a less desirable position, alteration of job responsibilities, or unsatisfactory job evaluations." Id. at *4 (citing Lebovsky, 394 F. App'x at 939). Although the meeting was upsetting, "a reasonable employee in her position would not have found" it so intolerable that she would have to resign. Id. at *5. And as she had already resigned, the employer's decision not to take her back was not an adverse action. Id.

Similarly, in Lobovsky, plaintiffs' allegation of a persistent pattern of discriminatory and retaliatory conduct and his de facto demotion were insufficient to survive summary judgment on his constructive discharge claim. 394 F. App'x at 939-40. After four years as a deputy city solicitor in a special litigation unit, he was named acting chief deputy, but when a new solicitor was named, he was advised that "new, young attorneys" would be brought on to staff the unit. Id. at 937. He formally complained and was reassigned to a position as a senior attorney, and management declined a recommendation that he be returned to the title of chief deputy. Id. Despite plaintiff's testimony that he was threatened with discharge and "to find work to do . . . or be fired," that his reassignment constituted a demotion to work that was less desirable, less secure

22

and with a less desirable office, and that he was no longer assigned a secretary or had his name included on settlement documents, the Third Circuit affirmed the trial court's conclusion that, "alone or collectively," no reasonable factfinder could conclude that plaintiff "suffered under conditions . . . so intolerable that he had no recourse but to quit." Id. at 939-40; see also Clowes, 991 F.2d at 1161-62 (reversing jury verdict in favor of plaintiff on her claim of constructive discharge where, in eight months working under new supervisor, plaintiff's supervisor constantly checked and criticized her, spoke in demeaning manner and sharply criticized her in front of other employees, assessed her "fair" whereas in thirty years the lowest rating she received was "good," resulting in plaintiff being directed to address her deficiencies and be subject to periodic review and possible disciplinary action).

Plaintiff argues that the events of June 27, following "months of discriminatory harassment" and the removal of her job responsibilities, amount to constructive discharge. Doc. 30 at 13. Plaintiff points to her 5:32 email as evidencing that her separation from employment was not voluntary. However, the entirety of the events on June 27, even in the light of the history that preceded them, do not establish constructive discharge.

As summarized above, Plaintiff perceived that her authority was being undermined by Dr. Frederique in various ways during her time working for Defendant, culminating in the events of June 27. On that day, Plaintiff emailed the Partners asking that her duties be clarified in light of being told by staff of changes in the billing, and accusing the Partners of excluding her from "crucial conversations regarding office

23

processes." 11:19 a.m. email.  Following that email, Dr. Frederique and Plaintiff met in Plaintiff's office, and during that meeting Dr. Frederique approached Plaintiff across her desk causing her to back up against the wall, and waived a piece of paper at her and yelled that he had witnesses to the meeting.  Pl. Dep. at 43-50.  Plaintiff immediately emailed Dr. Wendell to report the meeting to him, explaining that Dr. Frederique accused her of not following his instructions and told her that she would not have to deal with billing anymore.  12:16 email.  Plaintiff asked Dr. Wendell "if you would like me to leave," stating that "neither I nor anyone else on staff should be subjected to anything like this."  Id.  Then, in Dr. Frederique's afternoon email, he stated that the billing "catastrophe" occurred on Plaintiff's watch, although the biller and the Partners also shared responsibility, and stated that he and Dr. Khan would "take over all aspects of the billing process."  4:37 email.  An hour later, Plaintiff responded that she was "shocked" at being falsely accused of the billing problems and "amazed" at Dr. Frederique's disrespectful demeanor, and that "I . . . accept your email as my termination notice effective now."  5:32 email.  The next day Dr. Wendell texted Plaintiff to say that Plaintiff had not been terminated, but Plaintiff never returned to work.

As upsetting and demeaning as this must have been for Plaintiff, the conduct she complains of does not rise to a constructive discharge.  Reviewing the relevant factors, she was not threatened with discharge, nor did anyone suggest that she resign.  Even Dr. Frederique's email, which Plaintiff perceived as effectively terminating her, nowhere suggested that Plaintiff was being terminated or should resign.  Indeed, it stated that Plaintiff had "many responsibilities," and provide direction on the most pressing of these.

24

Furthermore, Plaintiff was not demoted and did not experience any reduction in pay or benefits. She was not transferred or reassigned, and her title was not changed. The only factor of the constructive discharge analysis in Plaintiff's favor is that her job responsibilities regarding billing were changed. But it is not disputed that billing was one of Plaintiff's many responsibilities, and that her other duties and job title remained the same. Rather than being told that she should leave, Plaintiff was the one who suggested it, and when she told Dr. Wendell that she believed that she had been terminated by Dr. Frederique, Dr. Wendell responded that she had not been terminated.

Viewed from the perspective of a reasonable employee, as the law requires, Plaintiff has not established an objectively intolerable situation that would compel any reasonable employee to resign. See, e.g., Hopson v. Dollar Bank, 994 F. Supp. 332, 340 (W.D. Pa. 1997) (denial of promotion coupled with racist comment that department was getting "too dark" did not establish constructive discharge); Mayo v. Bangor Area Sch. Dist., Civ. No. 11-6026, 2013 WL 3716533, at *12-13 (E.D. Pa. July 16, 2013) (granting summary judgment on constructive discharge claim where plaintiff school psychologist was told in July that she would be terminated for job performance issues if she did not resign but she did not resign at that time and the termination charge was withdrawn, and in September she resigned complaining that her office was relocated and she had to share work space and no longer had access to school laptop computer); cf. Suders v. Easton, 325 F.3d 432, 446 (3d Cir. 2003) (summary judgment should have been denied on constructive discharge claim in light of plaintiff's evidence that met severe and pervasive definition of hostile work environment, and harassers made clear through repeated acts of

25

intimidation that plaintiff was not wanted at the station and set her up to be charged with theft), overruled on other grounds, 542 U.S. 129 (2004); Gross, 747 F.3d at 888-89 (affirming finding of constructive discharge where plaintiff was involuntarily transferred after her supervisor questioned her ability to combine a career with motherhood); Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 412 (3d Cir. 1999) (reversing grant of summary judgment on constructive discharge claim where plaintiff was involuntarily transferred to two less desirable schools and then resigned after his termination was recommended).

For these reasons, I find that Plaintiff has failed to satisfy a prima facie case of age discrimination, and that Defendant is entitled to judgment as a matter of law as to Count II and the corresponding portion of Count III.

### 2.    **Sex Discrimination**

Title VII prohibits discrimination "because of" or "on the basis of" various protected classes, including sex.  42 U.S.C. § 2000e-2(a)(i).  To establish a prima facie case of sex discrimination under Title VII, Plaintiff must show that (1) she was a member of a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) that this occurred under circumstances that give rise to an inference of unlawful discrimination.  Summy-Long v. Pa. State Univ., 715 Fed. App'x 179, 182 (3d Cir. 2017) (citing Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003)); Jones, 198 F.3d at 410-11.

As in the previous section addressing Plaintiff's age-based claims, there is no dispute that Plaintiff satisfies the first and second elements of her prima facie case, as she is female and qualified for the Practice Administrator position.  However, Plaintiff has

failed to satisfy the third element of the prima facie case of sex discrimination -- that she was subjected to an adverse employment action.  Similar to her age discrimination claim, the sole adverse employment action she relies on to support her sex discrimination claim is her constructive discharge.  Doc. 30 at 14-15) (arguing that she met the third element of her prima facie case "as Defendant constructively terminated her employment," and that a jury could "find that a reasonable person subjected to the same circumstances would feel compelled to resign").  For the reasons discussed at length already, Plaintiff's evidence falls short of establishing a prima facie case of constructive discharge.

Additionally, Plaintiff fails to satisfy the fourth element of a prima facie case of sex discrimination.  Unlike her age claim -- where she could show that she was replaced by a "sufficiently younger" person -- the circumstances of her departure do not give rise to an inference of sex discrimination.  As previously noted, except for physicians, all of Defendant's staff members were female, see Dr. Wendell Dep. at 78; SUF ¶ 10-11; Pl. Res. to SUF ¶ 10, and after Plaintiff's departure, Defendant replaced her with a 40-year-old female, who was in turn replaced by a 42-year-old female.  SUF ¶¶ 12-13; Pl. Resp. to SUF ¶¶ 12-13.  Although these facts are not by themselves determinative, see Pivirotto, 191 F.3d at 354 ("The fact that a female plaintiff claiming gender discrimination was replaced by another woman might have some evidentiary force . . . [b]ut this fact does not . . . foreclose the plaintiff from proving that the employer was motivated by her gender"), Plaintiff has not provided sufficient evidence to indicate that her departure occurred under circumstances that give rise to an inference of unlawful sex discrimination.  See, e.g., id. at 358-59 (plaintiff failed to present sufficient evidence of

termination under circumstances which give rise to an inference of unlawful discrimination where defendant-chairman remarked that women were unreliable because they get pregnant and get cancer, plaintiff was fired more quickly than her male predecessor, and male employee was not subjected to disciplinary procedure); Moore v. Sec'y U.S. Dep't of Homeland Sec., 718 F. App'x 164, 166 (3d Cir. 2017) (fourth prong of prima facie sex discrimination case not satisfied where defendant used a new writing assessment for position plaintiff sought, application process was led by male with whom plaintiff had a previous employment-related disagreement, and plaintiff had previously been denied leadership roles and promotions).

Moreover, to the extent Plaintiff would seek to satisfy the fourth prong based on her perception that the Partners referred to the adult female employees as "girls" to make them feel "insignificant," Pl. Dep. at 92, such references similarly do not suffice to infer unlawful discrimination.  See Pivirotto, 191 F.3d at 359 (in fourth-prong gender discrimination context, "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly where they were made temporally remote from the date of decision.") (citation omitted); c.f. Burlington N., 548 U.S. at 68 (in adverse action context, "Title VII . . . does not set forth a general civility code for the American workplace") (internal quotations omitted); Nardella, 997 F. Supp.2d 286 at 297 (in hostile work environment context, "[Title VII] does not protect against all workplace difficulties, including crass and unwarranted behavior.") (citation omitted)).

28

For these reasons, I find that Plaintiff has failed to satisfy a prima facie case of sex discrimination, and that Defendant is entitled to judgment as a matter of law as to Count II and the corresponding portion of Count III.

## IVI.    __CONCLUSION__

Plaintiff fails to show that she was subjected to a constructive discharge for purposes of satisfying a prima facie case of age or sex discrimination under federal and corresponding state law, and fails to make a showing of either severe or pervasive harassment to satisfy the elements of age- and sex-based hostile work environment. Accordingly, I will grant Defendant's motion for summary judgment and enter judgment for Defendant and against Plaintiff.

An appropriate Order follows.